## HARRISON FAY *vs.* ALLIANCE INSURANCE COMPANY.

In the case of a partial loss of freight, one half of which is covered by a policy of insurance, and the value of which, mentioned in the policy, is less than the actual amount of the freight, the rule for the assessment of damages is the proportion of the valuation which the freight actually lost bears to the real value of the freight.

*It seems,* that the testimony of the assured to the statements of the president of an insurance company after the writing of the policy, as evidence of a usage tending to explain it, is not rendered incompetent, under the statutes of this commonwealth, by the death of the president.

*It seems,* that under a bill of lading, otherwise in the usual form, but having upon its face these clauses: " Goods to be received at the ship's tackles, when ready for delivery; freight payable before delivery, if required; " not merely safe arrival and notice thereof to the consignee, but reasonable time to enable him to receive his goods at the ship's tackles, is necessary to the earning of freight.

A policy of insurance upon freight on a voyage to a port of discharge in Australia terminates at the first port at which cargo is discharged.

A policy of insurance was made upon the freight of a ship on a voyage " from New York to port of discharge in Australia." The ship arrived at Geelong in the bay of Port Philip, there discharged part of her cargo, destined to Geelong, afterwards proceeded to Hobson's Bay, which is an anchorage ground for the port of Melbourne, also within the bay of Port Philip, but twenty five miles from Geelong, and to which the rest of the cargo was destined, and was there destroyed with part of her cargo by fire. Upon the trial of an action for this loss of freight, it was proved that Geelong and Melbourne were legally two distinct ports, each having a custom-house, and with a coasting trade between them, and were largely known commercially as distinct ports, that distinct contracts were commonly made in reference to them, and that Port Philip was not a port of entry. The assured contended that the whole bay of Port Philip was treated by commercial usage as a single port of discharge, including Geelong, Hobson's Bay and Melbourne, as merely separate landing-places within it; and introduced evidence that at the time of loading the vessel the president of the insurance company was informed that she was to carry freight to Geelong, and said that no change in the policy was necessary, because she was insured to a port in Australia, Port Philip was the port intended, and Geelong was one of the landing-places in Port Philip; and also evidence that when shipments were made designed for Geelong or Melbourne, Port Philip was used as a more general and comprehensive term, in the same way as Australia or a port in Australia was used, without indicating the particular port; that some policies of insurance had been made to Port Philip, and that charter parties and bills of lading had been made in which Port Philip was named as a port of destination. But it did not appear that uniformly or usually these contracts were made in reference to more than one of the ports within the bay; or that before the making of the policy in suit there had ever been a loss adjusted under a policy of insurance, in which the question arose whether Port Philip was commercially regarded as a single port, or any policy made upon which such a question arose afterwards. *Held,* that there was no evidence of such a distinct, well settled and uniform usage as would maintain the action.

ACTION OF CONTRACT on a policy of insurance for $12,500 upon the freight of ship Columbia, valued at $25,000, " at and from New York to port of discharge in Australia "; payable, in case of loss, in sixty days after proof and adjustment thereof.

At the trial before *Hoar,* J., it appeared that the ship arrived at Geelong in the bay of Port Philip, and there discharged the part of her cargo consigned to Geelong and received the freight thereon ; a fortnight afterwards proceeded to Hobson's Bay with the rest of her cargo, which was consigned to that place, and there discharged part of it; that the cargo then remaining was lumber owned and consigned to Walter Arnold, a passenger

on board, whose bill of lading, in other respects in the usual form, had upon its face the following clauses : " Goods to be received at the vessel's tackles, when ready for delivery; freight payable in specie or equivalent before delivery, if required ; " and who, upon notice that his lumber was ready for delivery and demand by the master of the vessel, paid $6000 on account of the freight thereon, which amounted to $18,678; that three days afterwards, and before any of this lumber had been delivered, the ship and lumber were destroyed by fire; and that the whole freight list of the vessel amounted to $28,183.85, and the freight actually received to $8,283.41. The plaintiff testified that at the time of loading the vessel he went to the defendants' president, (since deceased,) told him there was freight going on board to be left at Geelong, and asked him if it was necessary that any change should be made in the policy; that he looked at the policy, and said that he did not see a necessity of any change, that the policy was to a port in Australia and no particular port was mentioned, that Port Philip was the port intended and Geelong was one of the landing-places in Port Philip. The substance of the rest of the evidence introduced at the trial is stated in the opinion.

The defendants made the following objections to the admission of the evidence : " 1st. That the evidence offered to establish a construction of the policy by usage was inadmissible, because it tended not merely to vary or control an unambiguous contract, but to introduce terms completely repugnant to it, and so not within any rule of evidence as to usage. 2d. That the evidence of usage as to bills of lading and charter parties being contracts made *diverso intuitu* from policies, was inadmissible. 3d. That the testimony given by the plaintiff was not by law admissible, nor was he a competent witness."

The defendants also asked the court to instruct the jury " 1st. That the evidence, thus admitted, if believed, will not entitle the plaintiff to recover. 2d. That, under the peculiar provisions of this bill of lading of Arnold's lumber, the delivery of the lumber was not a condition precedent to the earning of freight; but that the safe arrival at the port of discharge,

and notice to the consignee, make the freight payable. 3d. That at least the $ 6000 of freight paid by Arnold, under the facts proved, could not be recovered back from the plaintiff, and was not a lost freight. 4th. That the whole freight list being $ 28,183.85, and the insurance on one half of it, valued in the policy at $ 25,000, and the freight actually received being $ 8283.41, the $ 8283.41 was to be deducted from the $ 25,000, and the defendants to pay half the balance."

But the judge admitted the evidence, and, for the purposes of the trial, declined to instruct the jury as requested; and instructed them " that the question for them to determine, in the first instance, was, whether the whole bay of Port Philip, with its several places of anchorage and discharge, constituted, by the general commercial usage and understanding at the time this policy was made and the voyage performed, a single port of discharge in Australia; that the meaning of the words, ' port of discharge in Australia,' used in the policy, might be ascertained by admitting parol evidence to show what meaning and extent, in the general understanding of the mercantile world, is attached to this word ' port,' as applied to the place where, by the policy, the risk is made to end; that, although this mercantile sense attached to this term may give the port in question a greater or less extent than its legal or political limits, yet the mercantile sense and not the legal import of the word must prevail; that the conversation with the president of the defendants was not admissible as evidence to control or explain the contract created by the policy, but was only evidence on the point whether Port Philip was, by general commercial usage and understanding, a single port of discharge in Australia, and that it should have no other or further effect in relation to this particular policy; that, under the provisions of the bills of lading in this case, safe arrival and reasonable notice to the consignee, giving him time sufficient to receive the cargo at the end of the ship's tackles, were necessary to the earning of the freight thereon; and mere safe arrival and notice thereof to the consignee did not enable the ship owner to recover his freight, or put the property, so far as the freight thereon was concerned, at the risk of the shipper,

if no such opportunity to receive the cargo was afterward afforded; that to the extent to which the cargo might have been received after reasonable notice to the consignee, as before stated, the freight was payable by him, and should be deducted from the amount of loss claimed; that, for the purposes of the trial, they would, if they found for the plaintiff, deduct from the whole freight, $ 28,183.85, the freight earned, $ 8283.41, and deliver their verdict for one half the balance, with interest from sixty days after they should find that preliminary proof had been offered by the plaintiff to the office, or find any waiver thereof by the defendants; making however such allowance, if any, before casting interest for freight of goods not received by the consignee, after reasonable notice, upon the principles before stated, as they should find proper under the evidence."

The jury returned a verdict for the plaintiff, and the judge reported the case for the decision of the full court.

*D. Thaxter & R. Choate,* (*S. Bartlett* with them,) for the defendants.

*B. R. Curtis & G. S. Hillard,* for the plaintiff.

Hoar, J. The rule for the assessment of damages, which was adopted for the purposes of the trial, was erroneous. This was a case of partial loss, and the underwriters were responsible only for the proportion of the amount of the entire valuation of freight in the policy, which the freight actually lost by the peril insured against bore to the actual value of the entire freight. 1 Arnould Ins. 305. *Forbes* v. *Aspinall,* 13 East, 327. *Wolcott* v. *Eagle Ins. Co.* 4 Pick. 436. The rule adopted at the trial would deprive the defendants of the whole benefit of the valuation in the policy, as applicable to the freight lost; while the rule for which the defendants contended would deprive the plaintiff of the benefit of the value of the freight which was earned, above its proportionate valuation in the policy. The latter would operate very injuriously to the underwriters in a case in which there should be an overvaluation of freight and the partial loss should be a very small one. The more equitable course for both parties is to treat the valuation as applicable to any part lost, in like proportion as it would be to the true value of the whole.

The other instructions which were given at the trial seem to the court to have been substantially correct; * but we have not given to them all the full and particular consideration which their importance and the novelty of some of them might demand if the decision of the case depended upon the disposition made of them; because we are all of opinion that the defendants were entitled to one ruling which was refused, and that for this reason the verdict must be set aside and a new trial granted.

The insurance was upon the freight of the ship Columbia on a voyage from New York to a port of discharge in Australia. The ship arrived at Geelong in the bay of Port Philip, and there discharged a part of her cargo. About two weeks after she proceeded from Geelong to Hobson's Bay, which is an anchorage ground for the port of Melbourne, twenty five miles from Geelong; and there the vessel and a part of the cargo were burned. If Geelong was a port of discharge, and going to Hobson's Bay was leaving that port and going to another, the risk had terminated before the loss occurred. The insurance being to a single port of discharge, the first port at which bulk was broken was the terminus of the voyage insured. *Coolidge* v. *Gray*, 8 Mass. 527. *King* v. *Middletown Ins. Co.* 1 Conn. 184. *Lapham* v. *Atlas Ins. Co.* 24 Pick. 1.

But the plaintiff contended that the whole bay of Port Philip, with its several places of anchorage and discharge, constituted, by the general commercial usage and understanding, at the time this policy was made and the voyage performed, a single port of discharge in Australia; and were allowed to offer evidence in support of this proposition. The defendants then asked the court to instruct the jury, " that this evidence, if believed, will not entitle the plaintiff to recover."

---

* In the argument were cited, upon the question of the competency of the plaintiff as a witness, *Sts.* 1856, *c.* 188 ; 1857, *c.* 305 ; 1859, *c.* 230, § 2 ; *Almgren* v. *Dutilh*, 1 Seld. 28 ; and upon that of the construction and effect of the bills of lading, *Brittan* v. *Barnaby*, 21 How. 527 ; *Griggs* v. *Austin*, 3 Pick. 20 ; *Strong* v. *Natally*, 1 New Rep. 16 ; Abbott on Shipping, (7th ed.) 406 – 409 ; 1 Parsons Marit. Law, 222.

We think this instruction should have been given. There was, it is true, some evidence on the part of the plaintiff, and the weight of evidence is for the jury to determine. But if all the evidence offered, with all the inferences which can be drawn from it, is not legally sufficient to establish the fact in issue, it is not to be left to the jury to find the fact. Evidence may be competent, as tending to establish a fact, and yet be wholly insufficient, for the want of other evidence essential to its completeness. *Parks* v. *Ross,* 11 How. 362.

It was proved that Geelong and Melbourne were legally two distinct ports, each having a custom-house, and with a coasting trade between them ; and a part of the cargo was destined for Geelong, and the remainder for Melbourne. They were twenty five miles apart, in the bay of Port Philip, which is thirty miles deep by forty wide ; and the bay is not itself a port of entry. The usage which the plaintiff undertook to establish was a usage to treat the bay of Port Philip for all commercial purposes as a single port of discharge, including Geelong, Hobson's Bay and Melbourne as merely separate landing-places within it. To give such a usage any legal effect in the construction of the contract between these parties, it must appear to have been uniform, settled and well understood at the time the contract was made, in November 1853.

On examining carefully the evidence offered, it does not appear, in the first place, that prior to November 1853 there had ever been a loss adjusted under a policy of insurance, in which the question arose whether Port Philip was commercially regarded as a single port in Australia; or that any policy was then made upon which such a question afterward arose. It appears that some policies were made to Port Philip, and that charter parties and bills of lading were made in which Port Philip was named as the place of destination ; but it does not appear that uniformly, or usually, and perhaps not in a single instance, these contracts were made in reference to shipments to more than one of the ports within the bay. The usage was certainly not uniform, because a large proportion of the instruments named Melbourne, and some of them Geelong, specifi-

cally, as the port of destination. John S. Tyler, the witness whose testimony was perhaps the strongest for the plaintiff, speaks of the naming Port Philip, when shipments were designed for Melbourne or Geelong, as arising from ignorance of the geography of the country, and from a want of accurate information as to the particular landing-places for goods destined to one place or the other. He says that Port Philip was used as a more general and comprehensive term, in the same way that Australia or a port in Australia was used, without indicating the particular port. But it would hardly be argued that under a policy to Australia, or to a port in Australia, there would be included a right to go to successive ports, at any distance from each other, in that country. The custom which he indicates would seem to be only a custom to insure to Port Philip, and under that insurance to go to either of the ports or landing-places included within that description; giving a similar extent of choice as in the case of an insurance to Australia, but not including more than one. The testimony of the plaintiff as to the statement made by the president of the defendants' company, which would not in itself be sufficient to establish a usage, does not show that he knew that goods were to be shipped for more than a single port of discharge.

A case somewhat resembling this is the case of *Vos* v. *Robinson*, 9 Johns. 192. There a vessel was insured " at and from Port Plata, St. Domingo, to New York;" and in going from Port Plata to Susua, which is in the district bearing the name of Port Plata, and about eighteen miles east of the port, in order to take in a cargo, she was driven into the bay of Isabella, in the same district, and there lost. She had a permit from the custom-house at Port Plata to go to Susua to obtain her cargo, and would have been obliged to return to Port Plata to pay the duties and get a clearance, such being the usual course of trade there. The custom-house and port of entry were confined to the particular place called Port Plata, and the district, for the purposes of revenue, which bears that name, extended nearly a hundred miles along the coast of St. Domingo. Port Plata is a safe harbor, but Susua and Isabella are open roads,

and dangerous when particular winds prevail. It was held that Port Plata proper and the district of Port Plata were different objects and the perils distinct; that the going from Port Plata to Susua was a deviation; and that nothing but a clear, well settled and well understood usage of trade, which the evidence did not show, would be sufficient to include both objects under the simple name of Port Plata.

We think that the evidence in the case at bar fell far short of showing that Port Philip was by a distinct, well settled and uniform commercial usage regarded as a single port of discharge, in which Melbourne and Hobson's Bay and Geelong were merely landing-places. On the contrary, it showed that while ignorance of the particular ports often led to the use of Port Philip in commercial instruments as a general term to include whatever port within it might be the port of destination, Melbourne and Geelong were to a large extent known commercially, as they were legally, as distinct ports, and that distinct contracts were very commonly made in reference to them.

*New trial granted.*